UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UTICA FIRST INSURANCE COMPANY, *as subrogee of A.N.G DINER CORP., d/b/a SILVER SPOON DINER*,

                    *Plaintiff*,

– against –

LSS LEASING LIMITED LIABILITY COMPANY, *et al.*,

                    *Defendants*.

**MEMORANDUM & ORDER**
24-cv-00401 (NCM) (VMS)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Utica First Insurance Company brings this subrogation action on behalf of its insured, A.N.G. Diner Corp., doing business as Silver Spoon Diner ("A.N.G."), against defendant LSS Leasing Limited Liability Company ("LSS"), the United States Postal Service, the United States, and Consolidated Edison Company of New York, Inc. ("Con Ed"). Before the Court is LSS's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] For the reasons stated below, defendant's motion is **GRANTED**.

## BACKGROUND

In January 2014, A.N.G., a restaurant, entered into a commercial lease for premises within a building owned by defendant located at 5821 Junction Boulevard in

---

[1] The Court hereinafter refers to the Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, ECF No. 37-6, as the "Motion"; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion, ECF No. 38, as the "Opposition"; and the Reply Memorandum of Law in Support of Defendants' Motion, ECF No. 39, as the "Reply."

1

Queens County, New York. Compl. ¶¶ 21–22, ECF No. 1; *see also* Mot. Ex. D., ECF No. 37-4 ("Lease").[2] In addition to the premises leased to A.N.G., defendant leased other space within the building to defendant United States Postal Service ("USPS"). Compl. ¶ 28. Pursuant to its lease agreement, A.N.G. "agree[d] to waive its right of subrogation against [defendant]" and further agreed to "obtain a waiver from its insurance company releasing the carrier's subrogation rights against [defendant]." Lease 25.[3] A.N.G. obtained an insurance policy from plaintiff which provided property insurance coverage "for the [r]estaurant, its business, and property located within the [restaurant]." Compl. ¶ 37; *see also* Mot. Ex. E ("Policy"), ECF No. 37-5. The Policy contained a subrogation condition which permitted A.N.G. to "waive" its "right to recover, in writing, before a loss takes place without voiding coverage." Policy 157. However, plaintiff retained its right to subrogation "against the owner or insurer of the adjoining property or any other person or entity." Policy 155.

On June 27, 2022, a fire occurred "at the USPS Premises and/or the [A.N.G.] premises." Compl. ¶ 38. The fire originated in or near electrical equipment servicing the USPS premises. Compl. ¶ 38. The electrical equipment, which included "wiring, meters, and/or their component parts," was housed in an "electrical closet" located at A.N.G.'s premises. Compl. ¶ 21. Plaintiff alleges that the fire was caused by the "negligent activities" of LSS, USPS, and Con Ed. Compl. ¶ 39. The fire caused significant damage to

---

[2] In considering a motion for judgment on the pleadings, the Court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Gioconda L. Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 427 (S.D.N.Y. 2013).

[3] Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

2

A.N.G., resulting in losses in excess of $300,000. Compl. ¶¶ 41–42. Plaintiff reimbursed A.N.G. for its losses pursuant to the Policy. Compl. ¶ 43.

On July 19, 2022, plaintiff presented a notice of claim to USPS seeking to recover as A.N.G.'s subrogee for the losses caused by the fire. Compl. ¶ 3; *see also* Compl. Ex. A, ECF No. 1-1. USPS denied the claim approximately one year later. Compl. ¶ 6. Accordingly, on January 19, 2024, plaintiff commenced this action bringing one claim for negligence against defendants pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Compl. ¶¶ 1, 7. Following defendants' answers to the complaint and initial discovery, defendant LSS moved for judgment on the pleadings on the grounds that the waiver of subrogation provision in the Lease precludes any recovery against LSS. Mot. 5.

## LEGAL STANDARD

The legal standard governing a motion for judgment on the pleadings pursuant to Rule 12(c) is identical to that governing a motion to dismiss pursuant to Rule 12(b)(6). *Lively v. WAFRA Invs. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021).[4] When deciding a Rule 12(c) motion, a district court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor." *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015). Factual disputes are typically not the subject of the Court's analysis, as Rule 12 motions "probe the legal, not the factual, sufficiency of a complaint." *Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y.*, 64 F. Supp. 3d 459, 468–69 (E.D.N.Y. 2014). That is, "[t]he issue" on a motion for judgment on the pleadings "is not whether the plaintiff will ultimately prevail" but instead

---

[4] Throughout this Order, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

whether a plaintiff is "entitled to offer evidence to support the claims." *Schiappa, Sr. v. Brookhaven Sci. Assocs., LLC*, 403 F. Supp. 2d 230, 234 (E.D.N.Y. 2005).

In order to survive a motion for judgment on the pleadings pursuant to Rule 12(c), a plaintiff must state "a claim to relief that is plausible on its face." *Burgos v. Satiety, Inc.*, No. 10-cv-02680, 2011 WL 1327684, at *1 (E.D.N.Y. Apr. 5, 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although the Court takes all factual allegations contained in the complaint as true, it does not do so for legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" in a complaint. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

For purposes of the present motion, defendant does not dispute plaintiff's factual allegations nor whether the complaint sufficiently states a claim for negligence. *See* Mot. 8. Instead, defendant argues that judgment in its favor is warranted "because A.N.G. waived any right of subrogation against LSS pursuant to the Lease it entered with LSS," and plaintiff's insurance policy "permits A.N.G. to waive such rights without forfeiting coverage." Mot. 8. Thus, because plaintiff's rights as subrogee "are derivative of A.N.G.'s rights, claims[,] and causes of action," A.N.G.'s waiver of subrogation "renders [p]laintiff's claims here dismissible as a matter of law." Mot. 9.

The Court begins by discussing principles of contract interpretation and subrogation before turning to the waiver of subrogation provision at issue.

## I. Legal Principles

### A. Contract Interpretation

The Lease is governed and construed in accordance with New York law. *See* Lease 60. When interpreting a contract under New York law, "the intent of the parties governs." *Crane v. Co. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999). This intent is ascertained "from the plain meaning of the language employed" in the contract. *Id.* It is axiomatic that a contract should be "read as a whole, and every part . . . interpreted with reference to the whole[.]" *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324–25 (2007); *see also T.G.I. Friday's Inc. v. Nat'l Rests. Mgmt., Inc.*, 59 F.3d 368, 373 (2d Cir. 1995). Moreover, words and phrases in contract terms should be given their plain meaning. *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, 82 F.4th 161, 176 (2d Cir. 2023).

Whether contract language is ambiguous is a determination that is properly made by the Court. *See Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001). When determining whether a contract is ambiguous, the court must consider the entire contract to "safeguard against adopting an interpretation that would render any individual provision superfluous." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001); *see also RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003). At the pleading stage, all contractual ambiguities are resolved in plaintiff's favor. *See Liberty Mut. Fire Ins. Co. v. BRG Sports, Inc.*, No. 17-cv-02290, 2018 WL 3079694, at *2 n.2 (E.D.N.Y. June 21, 2018). Still, "[c]ontract terms are not ambiguous if they have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *RJE*, 329 F.3d at 314. Moreover, a court will not create ambiguity where there is none. *See Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 81 (2d

5

Cir. 2009) ("[A] court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous.").

### B. Waiver of Subrogation

Subrogation is an equitable doctrine permitting an insurer to "stand in the shoes of its insured and seek indemnification from third parties whose wrongdoing has caused a loss for which the insurer is bound to reimburse." *H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc.*, 617 F. Supp. 2d 152, 157 (E.D.N.Y. 2008) (quoting *Kaf-Kaf, Inc. v. Rodless Decorations, Inc.*, 90 N.Y.2d 654, 660 (1997)). "Contracting parties are free to waive their insurers' rights of subrogation." *Encompass Ins. Co. of Am. v. English*, No. 11-cv-02606, 2013 WL 796309, at *4 (S.D.N.Y. Mar. 5, 2013). However, a waiver of subrogation provision "cannot be enforced beyond the scope of the specific context in which it appears." *H & M*, 617 F. Supp. 2d at 157; *see also St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 84 (2d Cir. 2005). To determine the scope of a waiver of subrogation provision, a court must "look[] to the language of the lease agreement and the intent of the parties as expressed therein," including by examining the "context in which the waiver provision appears in the agreement." *H & M*, 617 F. Supp. 2d at 158.

### II. Application

Plaintiff acknowledges the waiver of subrogation provision but contends that it does not apply to the instant action. *See* Opp'n 8–9. Plaintiff argues that the waiver is inapplicable because the Lease provision containing the waiver, coupled with the intent of A.N.G. and LSS, "limits [A.N.G.'s] obligations under such waiver to claims arising solely out of [s]ubrogor's and [d]efendant LSS's landlord-tenant relationship created by the Lease for the [r]estaurant." Opp'n 9. Plaintiff asserts that the scope of the landlord-tenant

relationship—and, by extension, the waiver of subrogation—is limited solely to the restaurant, not the building at large. Opp'n 11. Plaintiff thus argues that "the waiver of subrogation clause applies only to the [r]estaurant for any risk of loss associated with it[.]" Opp'n 11. And in plaintiff's view, because the loss was caused by a fire which began in electrical equipment "servicing the USPS [p]remises—*not the [r]estaurant*," plaintiff's claim against LSS arises from defendant's "landlord-tenant relationship with USPS—*not with [s]ubrogor*." Opp'n 12 (emphasis in original). Therefore, plaintiff argues that the waiver of subrogation provision does not preclude its claim. Opp'n 12. The Court disagrees.

### A. *Waiver of Subrogation Provision*

The waiver of subrogation provision appears in the "Legal Requirements; Insurance" section of the Lease as follows:

> Owner and Tenant shall each use reasonable efforts to procure an appropriate clause in, or endorsement to, each of its insurance policies (insuring the Building and Real Property, in the case of Owner, and insuring Tenant's Property and Alterations in the case of Tenant), pursuant to which each insurance company waives subrogation or consents to the waiver of right of recovery by the insured prior to any loss. The waiver of subrogation or permission for waiver of the right of recovery in favor of Tenant shall also extend to any permitted assignees hereof or subtenants and all other parties or entities occupying or using the Premises in accordance with the terms of this Lease. The waiver of subrogation or permission for waiver of the right of recovery in favor of Owner shall also extend to the Building's managing agent, if any, any Lessor and any Mortgagee, respectively, as the case may be.

Lease 27.

The Lease further provides that:

> Tenant shall obtain and keep in full force and effect during the Term: . . . Replacement cost insurance an[d] including agreed amount endorsement on Tenant's machinery, equipment, furniture and fixtures, goods, wares, merchandise, improvements/betterments

7

> and Business Interruption/Extra Expense in sufficient amounts against damage caused by Fire and all other perils covered by a standard All Risk Insurance Policy. Tenant agrees to waive its right of subrogation against Owner and shall obtain a waiver from its insurance company releasing the carrier's subrogation rights against Owner.

Lease 25.

Contrary to plaintiff's suggestion, *see* Opp'n 11, the Lease does not contain language limiting this subrogation waiver. Indeed, the Lease contains a catch-all provision waiving "all right[s] of recovery":

> Nothing contained herein[ ]above shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Notwithstanding the foregoing, each party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty, and to the extent that such insurance is in force and collectible and to the extent permitted by law, Owner and Tenant each hereby releases and waives all right of recovery against the other or anyone claiming through or under each of them by law, by way of subrogation or otherwise. The foregoing release and waiver shall be in force only if both releasors' insurance policies contain a clause providing that such a release or waiver shall not invalidate the insurance, and also provided that such a policy can be obtained without additional premiums.

Lease 32–33. The Policy issued by plaintiff, in turn, contains a subrogation condition permitting A.N.G. to waive its right to recover without voiding coverage. *See* Policy 157.

Together, the plain language of these provisions clearly contemplate the "broad applicability of the waiver of subrogation clause," thus precluding plaintiff's negligence claim against LSS. *See Kaf-Kaf*, 90 N.Y.2d at 661; *see also id.* at 660–61 (concluding that waiver of subrogation provision applying to "any claim against the other party for recovery for loss or damage resulting from fire or other casualty" was sufficiently broad to preclude insurance carriers' negligence claims); *Cresvale Int'l Inc. v. Reuters Am., Inc.*, 684 N.Y.S.2d 219, 222 (1st Dep't 1999) ("Where a waiver of subrogation clause is limited

8

to a specific type of loss, a subrogation action is barred only to the extent its seeks recovery for those species of losses. Conversely, where a broad waiver clause extends to all losses covered by the policy, or where [a] subrogation action is inconsistent with the express provisions of the waiver of subrogation clause, all subrogation actions will be barred."); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 317 F. Supp. 2d 336, 340–41 (S.D.N.Y. 2004) (concluding that waiver of subrogation clause demonstrated "unambiguous intention to prevent [subrogation] actions" where the contract contained a "comprehensive waiver," the contract "specifie[d] that the [risk] [p]olicy would contain a waiver of subrogation clause," and the risk policy did in fact "contain[] such a clause").[5]

In light of the plain language of the Lease, plaintiff's suggestion that the waiver of subrogation provision should "be deemed ambiguous and resolved *against* Defendant LSS[] as the party who drafted the Lease[,]" is of no moment. Opp'n 17 (emphasis in original). There is no ambiguity in the Lease's waiver of subrogation. *See* Lease 32 ("Owner and Tenant each hereby releases and waives all right of recovery against the other or any one claiming through or under each of them by law, by way of subrogation or otherwise."). Plaintiff's disagreement with the interpretation of the subrogation waiver does not create an ambiguity in its terms as there is not a reasonable differing interpretation. *See Dollar Phone Corp. v. St. Paul Fire & Marine Ins. Co.*, No. 09-cv-01640, 2012 WL 1077448, at *11 (E.D.N.Y. Mar. 9, 2012) ("Ambiguity does not exist

---

[5] Plaintiff argues that *Kaf-Kaf* and *St. Paul* are distinguishable because, unlike the waiver of subrogation provisions in those cases, the waiver in the Lease is not "similarly broad." Opp'n 14–15. This argument is unavailing because, as the Lease expressly sets forth, A.N.G. and defendant intended to waive "all right of recovery against the other," Lease 32, and the waiver of subrogation provision applies to "any [l]oss," Lease 27. And as set forth more fully below, the "landlord-tenant relationship explicitly created by the Lease," Opp'n 15, goes beyond solely the restaurant premises. *See infra* Part II.B.

9

simply because one party urges it and the court will not insert ambiguity into a contract where there is none."), *report and recommendation adopted*, 2012 WL 1078994 (Mar. 30, 2012).

### B. Landlord-Tenant Relationship

Plaintiff attempts to resist this conclusion by arguing that the landlord-tenant relationship between A.N.G. and LSS created by the Lease necessarily limits the subrogation waiver. Specifically, plaintiff claims that the waiver of subrogation provision applies "only to the [r]estaurant," i.e., does not encompass losses arising from a fire originating in electrical equipment "servicing the USPS Premises—*not the Restaurant*." Opp'n 12 (emphasis in original). Plaintiff argues that A.N.G.'s "limited relationship" with LSS is best characterized "as owner/landlord and tenant of the *[r]estaurant*—as opposed to the [b]uilding as a whole." Opp'n 12 (emphasis in original). In support of this view, plaintiff argues that A.N.G.'s obligations under the Lease "do not extend beyond the [p]remises/[r]estaurant to the [b]uilding . . . or to any landlord-tenant relationship other than that of [s]ubrogor and [d]efendant LSS." Opp'n 12.[6] This argument is unavailling.

First, contrary to plaintiff's assertion, A.N.G.'s obligations under the Lease are not limited solely to the restaurant. Indeed, numerous provisions confer obligations on the tenant with respect to the building as a whole. For instance, A.N.G. is obligated to

---

[6] Plaintiff further argues that language in the Policy stating that plaintiff "retain[ed] [its] rights to subrogation against the owner or insurer of the adjoining property or any other person or entity," reflected the intent of the parties "to limit [A.N.G.'s] waiver specifically to claims arising out of the landlord-tenant relationship for the [r]estaurant." Opp'n 16. However, plaintiff fails to explain how a contract between itself and A.N.G. reflects the intent of different parties—A.N.G. and defendant—to a separate contract containing the relevant waiver of subrogation—the Lease. *See St. Paul*, 317 F. Supp. 2d at 340 ("New York courts, when enforcing waivers of subrogation, look to the specific terms of the waiver as executed by the parties.").

maintain its premises "in a manner which shall not detract from the character, appearance or dignity of the [b]uilding." Lease 15. A.N.G. may not use its premises in any way which adversely impacts "the proper and economic functioning of any of the [b]uilding [s]ystems." Lease 16. A.N.G. is also responsible for damage to any "part of the [b]uilding and the [b]uilding [s]ystems . . . caused by or resulting from carelessness, omission, neglect, or improper conduct of [A.N.G.]." Lease 23. A.N.G. is not permitted to "mark, paint, drill into, or in any way deface" any part of the building. Lease 67. A.N.G. must, at its own cost, install and maintain ventilation to eliminate odors or fumes which "in any way interfere with the quiet enjoyment of any of the other tenants or occupants of the [b]uilding." Lease 51. And A.N.G. may not "obstruct[] or encumber[]" any of the sidewalks, entrances, stairways, or other common areas of the building. Lease 67.

As the foregoing provisions make clear, the scope of the landlord-tenant relationship between A.N.G. and LSS—and, by extension, the scope of the subrogation waiver—was not restricted solely to the restaurant premises. Instructive on this point is *H & M Hennes & Mauritz LP v. Skanska USA Building, Inc.*, 617 F. Supp. 2d 152 (E.D.N.Y. 2008). The plaintiff there—an insurance carrier bringing claims in the name of its insured, a clothing store located in a retail mall—sued one of the store's contractors for damage to the retail space due to a flood purportedly caused by the negligent performance of one of the defendant's subcontractors as part of a renovation project. *Id.* at 154. The defendant moved for summary judgment on the grounds that the lease between the store/insured and the insured's landlord included a waiver of subrogation provision which precluded the plaintiff's claims. *Id.* at 153–54. The insurer contended that the waiver did not apply to the subcontractor "because the work it performed was outside the type of activities contemplated by the lease subrogation clause." *Id.* at 154.

11

The court concluded that the plain language of the subrogation waiver provision was "applicable as to [the defendant] and preclude[d] recovery by [the] plaintiff." *Id.* at 160. In reaching its conclusion the court observed that the lease "contemplate[d] more than a single unit or building containing discrete units, but rather discusse[d] a retail space within a large, interconnected [m]all containing other retail establishments, parking spaces, hallways, and numerous common areas." *Id.* at 158. Thus, contrary to the plaintiff's suggestion that the renovation project "had nothing to do with [the plaintiff]," the court reasoned that the project was "contemplated by the lease agreement and not wholly outside the scope of the landlord and tenant relationship." *Id.* at 157–58.

This reasoning applies with equal force here. For one, as the provisions detailed above illustrate, the Lease "contemplate[d] more than a single unit or building containing discrete units[.]" *Id.* at 158. The Lease agreement indicates that other tenants would occupy different areas of the building and establishes express obligations with respect to "parking spaces, hallways, and numerous common areas." *Id.*; *see also* Lease 67 (setting forth rules and regulations with respect to common areas of the building such as entrances, passages, stairways, and halls). Therefore, plaintiff cannot plausibly allege that the plain language of the Lease contemplates a single unit such that the landlord-tenant relationship was defined solely with respect to the restaurant premises. *See Phila. Indem. Ins. Co. v. B & L Mgmt. Co.*, 109 N.Y.S.3d 309, 2018 WL 3151479, at *4 (Sup. Ct. 2018) (unpublished table decision) ("[T]he loss experienced by [subrogor] is directly related to its landlord tenant relationship with the [o]wner, to wit, property damage caused by another unit in the [b]uilding."); *cf. Interested Underwriters at Lloyds v. Ducor's Inc.*, 478 N.Y.S.2d 285, 287 (1st Dep't 1984) (finding that losses from fire originating in an

12

adjacent building which happened to be owned by the subrogor's landlord "ar[o]se[] out of an act wholly outside the scope of the landlord and tenant relationship").

Further, the Lease specifically allocates responsibilities with respect to the building's "electrical systems," including that A.N.G. could not, without defendant's consent, make "electrical installations, alterations, additions or changes to electrical equipment" that would impact the building's systems. Lease 42; *see also* Lease 16 ("In no event shall [t]enant use, or permit the use of the [p]remises, or any portion thereof, in any manner which . . . will . . adversely affect . . . the proper and economic functioning of any of the [b]uilding [s]ystems[.]"). What's more, the Lease establishes that defendant may provide electricity to A.N.G. "by means of the then existing [b]uilding electric systems," Lease 51, which plaintiff appears to admit is how A.N.G. obtains its electricity. *See* Opp'n 6 ("An electrical closet services the [r]estaurant and the USPS Premises."); *see also H & M*, 617 F. Supp. 2d at 158 (reasoning that activity which caused the plaintiff's losses was "contemplated by the lease agreement and not wholly outside the scope of the landlord and tenant relationship" where the lease "specifically provide[d] for the possiblity" of such activity, and "grant[ed] [the plaintiff] various rights" in connection with such activity).

Plaintiff's allegation that the fire "originated in the portion of the electrical wiring/electrical equipment and/or meters and its component parts . . . of the [e]lectrical [c]loset which specifically service[] the USPS [p]remises," Opp'n 6, does not compel a different conclusion. For one, the view advanced by plaintiff slices the scope of the landlord-tenant relationship much too thin in light of the plain language of the Lease. According to plaintiff, the relationship between LSS and A.N.G. does not encompass the wiring, meters, and component parts within the single electrical closet that do not

13

specifically service A.N.G. despite the fact that (1) other components of the same electrical closet do service A.N.G.; and (2) the closet itself was located "at [A.N.G.] [p]remises." Compl. ¶ 21; *see also* Reply 5. But the Lease does not contemplate solely those building systems which exclusively service A.N.G.'s premises. In fact, the Lease states the exact opposite. *See* Lease 23 ("Owner shall maintain in good working order and repair . . . the [b]uilding [s]ystems serving the [p]remises (to the extent such [b]uilding [s]ystems presently exist and *do not exclusively serve the Premises*).") (emphasis added).

Therefore, in the absence of supporting contract language, the Court declines to adopt plaintiff's narrow view of A.N.G. and defendant's landlord-tenant relationship.[7] *See Footlocker, Inc. v. KK & J, LLC*, 894 N.Y.S.2d 380, 381–82 (1st Dep't 2010) (concluding that renovation work performed in basement restaurant of a building that caused "a fire that spread to [the subrogor's] leased premises, was not wholly outside the scope of the landlord and tenant relationship" because rider to lease agreement "refer[red] to the basement restaurant as located within the [b]uilding").

---

[7] Plaintiff points to the Lease provision requiring A.N.G. and defendant to "use reasonable efforts to procure an appropriate clause in, or endorsement to, each of its insurance policies (insuring the Building and Real Property, in the case of Owner, and insuring Tenant's Property and Alterations in the case of Tenant)," Lease 27, as "explicit language . . . delineat[ing] between [d]efendant LSS's responsibility with respect to the [b]uilding as a whole while [A.N.G.'s] responsibility is limited to the Premises/Restaurant." Opp'n 14. However, as explained above, the Lease confers other responsibilities on A.N.G. with respect to the building as whole. *See, e.g.*, Lease 16. And in any event, the relevant inquiry is the scope of the landlord-tenant relationship—which, here, encompassed building-wide systems—not simply the allocation of responsibilities between a landlord and tenant. *See* Lease 23; *see also State Farm Fire & Cas. Co. v. Pulse Creative, LLC*, 175 N.Y.S.3d 471 (Mem) (1st Dep't 2022) ("Plaintiff acknowledges that the damage arose from a condition within the demised premises, and asserts that defendant had the obligation to maintain or repair the condition. Thus, this loss arises out of the landlord-tenant relationship and falls squarely within scope of the broad waiver provision.").

### C. Equitable Considerations

Plaintiff urges the Court to deny defendant's motion because it "would be entirely unjust for [s]ubrogor, and [p]laintiff by extension, to be held liable for risks in connection with other property owned by [d]efendant LSS, such as the USPS [p]remises." Opp'n 16–17. Plaintiff is correct that the "principle of subrogation ought to be liberally applied for the protection of those who are its natural beneficiaries." Opp'n 16 (quoting *Ocean Acc. & Guar. Corp. v. Hooker Electrochem. Co.*, 240 N.Y. 37, 47 (1925)). Still, the Court must interpret the Lease to give each provision, including the waiver of subrogation provision, "force and effect." *Garden City Apts., LLC v. Xcel Plumbing of N.Y., Inc.*, 233 F. Supp. 3d 346, 355 (E.D.N.Y. 2017); *see also Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) ("A contract should be construed so as to give full meaning and effect to all of its provisions.").

And here, the provisions of the Lease "reflect[] the parties' intention to look first to their insurers for recovery of losses . . . and to release any right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise." *Kaf-Kaf*, 90 N.Y.2d at 660; *see also* Lease 32 ("[E]ach party shall look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty."); *accord Albany Ins. Co. v. United Alarm Servs., Inc.*, 194 F. Supp. 2d 87, 95 (D. Conn. 2002) ("[L]ooking at the plain language of the waiver [of subrogation] provision, there is no indication that the parties intended to limit the scope of the waiver provision in the manner suggested by [the plaintiff]. The waiver provision states that [the subrogor] discharges [the defendant] from and against all hazards covered by insurance, and that no insurance company shall have any right of subrogation.") (emphasis omitted).

15

Indeed, the very purpose of a waiver of subrogation provision is to "allocate the risk of liability" between parties "to third parties through insurance." *H & M*, 617 F. Supp. 2d at 159. To that end, permitting plaintiff's negligence claim to proceed against LSS would be "inconsistent with the express provisions of the waiver of subrogation clause" in the Lease agreement. *Cresvale*, 684 N.Y.S.2d at 222; *see also Great N. Ins. Co. v. Interior Constr. Corp.*, 796 N.Y.S.2d 51, 52 (1st Dep't 2005) ("[W]here, as here, sophisticated parties negotiating at arm's length have agreed to allocate the risk of liability to third parties between themselves, essentially through the employment of insurance, that agreement is enforceable."); *accord Atl. Specialty Ins. Co. v. AE Outfitters Retail Co.*, Nos. 07-cv-08508, 08-cv-02157, 08-cv-03294, 2014 WL 1918718, at *6 (S.D.N.Y. May 12, 2014) (concluding that waiver of claims provision in lease barred insurers-subrogees' claims against property owners because the provision was a "vehicle for risk allocation between sophisticated parties," and the provision "specifically move[d] risks away from the parties and towards their respective insurers").

\*   \*   \*

In sum, the Court concludes that plaintiff's losses resulting from the fire were "contemplated by the lease agreement and not wholly outside the scope of the landlord and tenant relationship." *H & M*, 617 F. Supp. 2d at 158. Therefore, the waiver of subrogation provision applies and precludes plaintiff's negligence claim against LSS. *See Am. Motorist Ins. Co. v. Morris Goldman Real Estate Corp.*, 277 F. Supp. 2d 304, 309 (S.D.N.Y. 2003).

## CONCLUSION

For the reasons stated above, defendant's motion for judgment on the pleadings is granted. Defendant LSS Leasing Limited Liability Company is hereby dismissed from the case. The case is respectfully referred to Magistrate Judge Vera M. Scanlon for pretrial supervision.

**SO ORDERED.**

                                                                                       _/s/ Natasha C. Merle_
                                                                                       NATASHA C. MERLE
                                                                                       United States District Judge

Dated:        November 17, 2025
                  Brooklyn, New York